UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. |
| **MBS MANAGEMENT SERVICES, INC.** | **07-12151** |
| | SECTION A |
| DEBTOR | CHAPTER 11 |
| **CLAUDE LIGHTFOOT, TRUSTEE FOR THE MBS UNSECURED CREDITORS' TRUST** | ADVERSARY NO. |
| | **09-1158** |
| PLAINTIFF | |
| VERSUS | |
| **MXENEGY ELECTRIC, INC.** | |
| DEFENDANT | |

## **MEMORANDUM OPINION**

Trial in the above-captioned proceeding was held on May 27, 2010. At its conclusion, the Court took the matter under advisement.

**I. Facts**

On December 12, 2005, MBS Management Services, Inc ("MBS") and Vantage Power Services, LP ("Vantage") entered into a Commercial Agreement ("the Contract") that required Vantage to "supply the full requirements" of electricity to MBS, with MBS required to "receive and take its full electric requirements from Vantage."[1]

The Contract provided that the "Energy Charges will be calculated by multiplying the total monthly-consumed kilowatt hours multiplied by the Energy Price listed in the Price Exhibit."[2] The

---

[1] Exh. MX1.

[2] *Id.*

Price Exhibit set a term of twenty-four (24) months for the Contract and listed the price as $.0119 per kWh.[3]

Although the Contract was signed by MBS, MX actually delivered electricity to forty-five (45) separate companies under the Contract. Each of these companies was a sister company to MBS and owned separate apartment complexes located throughout Texas. The companies were managed by MBS. None of the sister corporations signed the Contract.

MX's accounting records divided the charges incurred into forty-five (45) sub-accounts based on the delivery location for the electricity provided. Each month, invoices for electrical service were mailed to MBS' main office for each sub-account. Each invoice identified the property to which service was delivered.

On April 16, 2007, Vantage and MX entered into an Asset Purchase Agreement whereby Vantage transferred to MX all of its electrical service agreements, including the Contract.

On November 5, 2007, MBS filed a voluntary Petition For Relief under Chapter 11 of the Bankruptcy Code. Following confirmation of its plan, MBS transferred all rights to avoid preferential or fraudulent conveyances to a litigation trust for prosecution. Claude Lightfoot was named trustee ("Trustee"). Trustee instituted several fraudulent conveyance and preference actions against various parties including MX.

**II. Law and Analysis**

Trustee seeks to avoid and recover payments of $156,345.93 made by MBS to MX. Trustee alleges that the payments were preferential under 11 U.S.C. § 547. At trial, the parties stipulated that the payments were made within ninety (90) days of MBS' bankruptcy filing, while MBS was

---

[3] *Id.*

2

insolvent, and entitled MX to receive more than it would have received in a chapter 7 liquidation. Because the parties have stipulated to all elements of a preference action, the resolution of this matter turns on MX's defenses to the complaint.

MX alleges that the payments cannot be recovered because it is a forward contract merchant, the Contract is a forward contract, and the payments in question were settlements under the Contract. In the alternative, MX alleges that the payments were received in the ordinary course of business or for new value.

### A. Exception to Avoidance Under 11 U.S.C. § 546(e)

11 U.S.C. § 546(e) prohibits avoidance of settlement payments made to a forward contract merchant on a forward contract. 11 U.S.C. § 101(25) defines a forward contract as:

> [A] contract (other than a commodity contract, as defined in section 761) for the purchase, sale, or transfer of a commodity, as defined in section 761(8) of this title, or any similar good, article, service, right, or interest, which is presently or in the future becomes the subject of dealing in the forward contract trade, or product or byproduct thereof, with a maturity date more than two days after the date the contract is entered into ...

11 U.S.C. § 101(25) requires MX prove that the Contract:

1. Was a contract for the sale of a commodity;

2. With a delivery date more than two (2) days after execution;

3. By a forward contract merchant;

4. That is not otherwise subject to the rules of a contract board of trade.[4]

---

[4] For the reasons set forth in this Court's earlier ruling (pl. 56), the contracts protected under 11 USC § 546(e) are contracts not traded or subject to the rules of a contract board of trade. *See*, 11 USC §§ 101(25) and 761(4).

3

All four elements under the statute have been satisfied. For the reasons assigned in this Court's prior Opinion on MX's Motion for Summary Judgment, the Contract involved the sale of electricity which is a commodity.[5] Neither party disputes that the Contract's initial delivery date was at least two (2) days following execution. According to the testimony of Jeffrey A. Mayer, President and Chief Executive Officer of MX, MX is in the business of buying and selling electrical power. It does not produce any of the power it markets. Therefore, the Court concludes that MX is a forward contract merchant. The record also establishes that the Contract was not subject to the rules or regulations of a contract board of trade, and MBS presented no evidence to refute this point.

Despite satisfaction of all statutory requirements, MBS argues:

1. That MX is not a party to the Contract; therefore, payments to it are not protected.

2. That Vantage never signed the Contract; therefore, the Contract is unenforceable, and the payments are not protected; and

3. The Contract is not a forward contract.

### B. MX Is the Successor in Interest to Vantage

MBS argues that MX has not established that the Contract was assigned to it by Vantage. The testimony of Mr. Mayer established that MX purchased all of Vantage's contracts in April 2007, including this Contract. Following the assignment, MX delivered invoices for electrical power to MBS without complaint. The invoices in question were satisfied by MBS with checks made payable

---

[5] Pl. 56; *See also*, *U. S. v. Reliant Energy Services, Inc.*, 420 F.Supp.2d 1043 (N.D.Cal. 2006). *See also, In re Nat'l Energy & Gas Transmission, Inc.*, 492 F.3d 297, 299 (4th Cir. 2007); *In re Erving Industries, Inc.*, 2010 WL 1416148 (Bankr.D.Mass. 2010); *In re Mirant Corp.*, 334 B.R. 800, 805 (Bankr.N.D.Tex. 2005); *In re Enron Corp.*, 274 B.R. 327, 334 (Bankr.S.D.N.Y. 2002); *In re Olympic Natural Gas*, 258 B.R. 161, 163 (Bankr.S.D.Tex. 2001); *In re Camelot Motors Corp.*, 86 B.R. 520, 523 (Bankr.W.D.Mich. 1988); *In re Charles Town Light & Power Co.*, 183 F. 160, 163 (D.C.W.Va. 1910).

to MX.[6]  Nothing in the record supports MBS' position that MX is not the owner of the Contract.

### C. The Contract is Enforceable Between the Parties

MBS next asserts that the Contract is unenforceable because Vantage never signed it. The Contract has a date of December 12, 2005. It is executed by MBS but unsigned by Vantage, now MX. Electricity was provided to MBS under the Contract for a minimum of twenty (20) months following its execution. Further, MX and Vantage invoiced MBS for the electricity supplied based on the price provided by the Contract. Vantage, and now MX, both performed under the Contract as required. MX has neither challenged the Contract nor its obligations under it. The Contract has been ratified by Vantage and MX's performance.[7] As the party who executed the Contract, MBS may not challenge MX's ratification in order to avoid its enforcement.[8]

### D. The Contract Qualifies as a Forward Contract

Finally, MBS argues that the Contract is not a forward contract because it is not for a set quantity of power but instead requires MX to supply all power needed by MBS. In support of its position, MBS cites *In re Olympic Natural Gas Co.*[9] and *In re National Gas Distributors*.[10]

---

[6] Exh. MX5.

[7] *Missouri Pacific R. Co. v. Lely Development Corp.*, 86 S.W.3d 787, 792 (Tex.App.-Austin 2002).

[8] *Id*.

[9] *Williams v. Morgan Stanley Capital Group Inc. (In re Olympic Natural Gas Co.)*, 294 F.3d 737 (5th Cir. 2002).

[10] *Hutson v. E.I. du Pont de Nemours and Co., Inc. (In re National Gas Distributors, LLC)*, 556 F.3d 247 (4th Cir. 2009).

5

The Bankruptcy Code protects from avoidance payments made on a "forward contract."[11] Nothing in the Bankruptcy Code requires that a forward contract provide for the purchase of the commodity at a set price or quantity. Nevertheless, it is generally accepted that forward contracts must specify the terms of sale, particularly price. Trustee seeks to impose an additional requirement regarding the quantity sold. Trustee argues that a contract at a set price but no set quantity is an imperfect hedge of the risks associated with the sale of a commodity. Contracts with imperfect hedges of risk cannot be forward contracts in the Trustee's estimation.

At trial, the Court heard testimony from Mr. Mayer, an expert in commodity trading of electricity; including the formation, regulation, and trading of contracts for the purchase and sale among producers, users, marketers, middle-men, and brokers; and the standards and requirements of those contracts whether they be forward or future contracts traded on or off-exchange. Mr. Mayer was also accepted as an expert in energy risk management. Mr. Mayer possessed extensive experience with the New York Mercantile Exchange ("Mercantile Exchange"), a commodity trading house in New York City that trades electrical futures contracts among other commodities contracts. He served as counsel to the Mercantile Exchange and helped draft the uniform commodity contract used by the Mercantile Exchange for all futures trading in electricity. In addition, he helped draft one of the most common forms of forward contract agreements used in forward contract markets.

Mr. Mayer's testimony provided many missing details regarding the futures and forward contract markets. He explained that futures contracts are uniform to facilitate trading between members of an exchange. They provide for the delivery of a commodity at a set price, quantity, delivery date, and place of delivery. In a commodities exchange, all futures contracts are submitted

---

[11] 11 U.S.C. § 546(e).

to a clearinghouse which assumes responsibility for the trade. The clearinghouse tallies the purchases and sales of individual members which are matched or offset within the member's account.

Because the clearinghouse assumes responsibility for delivery of the commodities involved, the members' accounts merely reflect the costs of purchase or sale in monetary terms. Those accounts compensate the clearinghouse for price fluctuations on the commodities acquired and delivered. For example, if A buys and sells the same quantity of corn on the same day, A's account will only reflect the difference in price between the two (2) trades as either a loss or profit. B's account, or more often B and C's accounts, reflect the other side of the contracts, balancing the loss or profit. But none of the members is required to actually deliver products or take delivery. Each is only responsible for the financial consequences of their trades.

In contrast, forward contracts are negotiated between industry participants and forward contract merchants. The industry participants are either producers or users of the commodity who sell or purchase the commodity in advance to hedge against price fluctuations. Forward contract merchants create or manage commodity markets by providing a place for industry participants to buy or sell a commodity in advance of its actual production.

There is no clearinghouse involvement with forward contracts. As a result, the forward contract merchant must deliver on the contracts to which it commits by supplying the commodity or taking delivery. While forward contracts provide an imperfect hedge against fluctuations in supply, the risks associated with an unexpected increase of demand for a commodity and the cost increases to purchase sufficient supply to fulfil the forward contract can be managed through security deposits, letters of credit, other financial instruments, or simply the creditworthiness of the

forward contract merchant. As a result, forward contracts for electricity do not typically limit the quantity sold or purchased. Instead, they are generally for the entire needs or demands of the purchaser.

The testimony of Mr. Mayer explained in sufficient detail why a forward contract differs from the uniformity of a futures contract. MBS offered no evidence to refute the opinions presented by Mr. Mayer, and the Court accepts his testimony as credible on the practices and procedures attendant with both markets.

Trustee argues that several courts, including the *Olympic* Court, have found that forward contracts must be for a specific quantity of goods.[12] However, in almost all cases, the contracts in question provided for a set quantity of goods at a set price. Therefore, the findings of the courts cited by MBS are *dicta* on the issue. Only in the case of *In re National Gas Distributors*,[13] did a North Carolina bankruptcy court hold that an all requirements contract was not a forward contract because the amount of product was not specified. The decision was based on the *dicta* contained in the previously indicated cases including a finding that "because the Wall Street Journal always quotes commodity contracts by price and quantity" both must be specified in order for a forward contract to exist. However, in so holding, the *National Gas* Court failed to note an important distinction between forward and futures contracts.

---

[12] *Williams v. Morgan Stanley Capital Group Inc. (In re Olympic Natural Gas Co.)*, 294 F.3d 737 (5th Cir. 2002); *In re Borden Chemicals and Plastics Operating L.P.*, 336 B.R.214 (Bankr.D.Del. 2006); *Hutson v. M.J. Soffe Co. (In re National Gas Distributors)*, 412 B.R.758 (Bankr.E.D.N.C. 2009); and *Hutson v. E.I. du Pont de Nemours and Co., Inc. (In re National Gas Distributors, LLC)*, 556 F.3d 247 (4th Cir. 2009).

[13] *Hutson v. M.J. Soffe Co. (In re National Gas Distributors)*, 412 B.R.758 (Bankr. E.D.N.C. 2009).

Futures contracts are traded on exchanges and regularly quoted in the financial papers by price, quantity, and delivery date. As previously noted, this creates an apples to apples market and facilitates trades between members of the exchange. The forward contract market is not so regulated nor uniform although forward contract merchants also create markets to buy and sell commodities. Because forward contracts are off-exchange trades, they may vary in their terms. The testimony of Mr. Mayer establishes that unlike futures contracts, forward contracts are not for specified quantities of the commodity. For the Court to require a forward contract to contain a condition that is not typically present would defeat the purpose of § 546(e) by narrowing its application. Nothing in the stature warrants such a limitation.

Trustee also argues that 11 U.S.C. § 546(e) was not designed to protect payments made under ordinary supply type contracts but only to protect derivative contracts or those made with pure financial hedging motives. He defines a "supply contract" as one between a consumer and broker or producer. Putting aside the issue of whether or not contracts solely between industry participants can qualify as forward contracts, Trustee argues that because the primary goal of MBS was to receive electricity, the Contract's purpose was not for financial risk management purposes.

Admittedly, even supply contracts have hedging or risk management attributes. By setting the price for electrical power, end users protect themselves against large fluctuations in price and stabilize their cost of power. As a result, Trustee must refine his position to admit that while the Contract contains hedging attributes, because those were not MBS' primary goal, it is not a forward contract. Trustee's position was squarely rejected by the United States Court of Appeal for the Fifth Circuit in *Olympic*.

In *Olympic,* the trustee argued a position identical to that of this Trustee. The Court found:

> [N]o reason ... to distinguish between "financial" forward contracts, and "ordinary purchase and sale" forward contracts, when the statutory language makes no such distinction.[14]

Based on the expert evidence submitted by MX, the Court finds that forward contracts include contracts for the sale or purchase of a commodity between an industry participant and forward contract merchant. They are not regulated or subject to the rules of a contract commodity exchange and provide a hedge against price fluctuations in a commodity market. They do not have to specify a set quantity for delivery, but are most often written to sell to the purchaser all it might need or demand of the commodity during the term of the contract.

Under the above definition, the Court concludes that the Contract was a forward contract and that the payments received by MX were settlement payments under the Contract. As a result, they are protected from avoidance by Trustee. Accordingly, the Court need not discuss MX's remaining defenses of ordinary course and new value.

MX's has requested a judgment against Trustee for attorneys' fees and costs incurred in connection with this matter.[15] "[A]bsent statute or enforceable contract, litigants pay their own

---

[14] *In re Olympic Natural Gas Co.*, 294 F.3d at 742. *See also*, *Hutson v. E.I. du Pont de Nemours and Co., Inc. (In re National Gas Distributors, LLC)*, 556 F.3d 247 (4th Cir. 2009) (supply contracts between industry participants are not *per se* excluded as forward contracts). This case is separate from *Hutson v. M.J. Soffe Co. (In re National Gas Distributors)*, 412 B.R.758 (Bankr.E.D.N.C. 2009), which involved different parties and contracts.

[15] Pl. 14.

10

attorneys' fees."[16] MX has not cited any statute or contract provision which supports an award of its fees and costs. As such, MX's request for attorneys' fees and costs is denied.

A separate Judgment will be rendered in accordance with this Memorandum Opinion.

New Orleans, Louisiana, June 29, 2010.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

---

[16] *Alyeska Pipeline Servcice Co. v. Wilderness Society*, 421 U.S. 240, 257, 95 S.Ct.1612, 1621 (1975) (citations omitted).